IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DALE R. ALLIO,

       Plaintiff,                       No. CIV S-05-1361 LKK GGH

    vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

                                      FINDINGS AND RECOMMENDATIONS

       Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, the court recommends that plaintiff's Motion for Summary Judgment or Remand be granted in part, the Commissioner's Cross Motion for Summary Judgment be denied in part, this case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for a computation of benefits but only in regard to a closed period of disability, and the Clerk of Court be directed to enter final judgment.

BACKGROUND

        Plaintiff, born August 30, 1953, applied for disability benefits on September 26, 2003. (Tr. at 44.) Plaintiff alleged he was unable to work since May 17, 2002, due to spinal

1

1  impairment (cervical and lumbar), pain, headaches, and fatigue. (Tr. at 43, 14.) In a decision

2  dated January 19, 2005, ALJ Antonio Acevedo-Torres determined that plaintiff was not

3  disabled.[1] The ALJ made the following findings:

>     1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
>     2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
>     3. The claimant's cervical radiculopathy, status post microdiscectomy and arthrodesis, mild disc bulging at L5-S1, and lumbar radicular syndrome are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

\\\\\

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

| | | |
|---|---|---|
| | 4. | These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. |
| | 5. | The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision. |
| | 6. | The claimant has the following residual functional capacity: lift 20 pounds occasionally and 10 pounds frequently, walk/stand two hours, sit six hours, occasionally perform postural activities. He has no manipulative, visual, communicative, mental, or environmental limitations. |
| | 7. | The claimant's past relevant work as distribution center manager did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565). |
| | 8. | The claimant's medically determinable cervical radiculopathy, status post microdiscectomy and arthrodesis, mild disc bulging at L5-S1, and lumbar radicular syndrome do not prevent the claimant from performing his past relevant work. |
| | 9. | The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)). |

(Tr. at 21-22.)

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physician; (B) Whether the ALJ Erred in Failing to Consider Plaintiff's Mental and Physical Non-Exertional Impairments; (C) Whether the ALJ Failed to Adequately Evaluate Plaintiff's Subjective Complaints; and (D) Whether the ALJ Erred in Relying on the Grids Rather Than Calling a Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

    A.  <u>Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physician</u>

Plaintiff claims that the ALJ erred in rejecting the treating opinions of Dr. Harris, a board certified orthopedic surgeon.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record;

---

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  <u>Lester</u>, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  <u>Lester</u>, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, <u>Edlund v. Massanari</u>, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); <u>see also</u> <u>Magallanes</u>, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  <u>Lester</u>, 81 F.3d at 831.

        In this case, the ALJ found that Dr. Harris' opinion that plaintiff could not even do sedentary work was at odds with clinical findings, and the objective findings of record indicated plaintiff's condition was not so severe.  The ALJ also rejected this opinion because it was inconsistent with the state agency physician and Dr. Roberson's opinions, because it was not supported by Dr. Meeks' clinical findings, and was inconsistent with plaintiff's daily activities.

        The records indicated that Dr. Harris apparently stopped treating plaintiff in June, 2003, but completed a residual functional capacity questionnaire a year later on June 11, 2004.  At that time, he diagnosed plaintiff with lumbar radicular syndrome, lumbar disc bulging, and found that plaintiff was permanent and stationary.  (Tr. at 212.)  Plaintiff was considered to be a

---

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1  surgical candidate. (Id.) He thought plaintiff's pain would interfere with his attention and
2  concentration frequently throughout a work day. (Id. at 213.) He opined that plaintiff could walk
3  two blocks, sit for 45 minutes at a time, stand for 45 minutes at a time, and sit/stand/walk for a
4  total of two hours in an eight hour day. (Id.) Plaintiff must be able to walk every 15 minutes for
5  15 minutes at a time. (Id. at 214.) He would need to frequently take unscheduled breaks lasting
6  15 to 20 minutes at a time. He could occasionally lift 20 pounds and frequently lift 10 to 20
7  pounds. (Id.) He thought plaintiff would need to be absent from work more than four days per
8  month. (Id. at 215.)

9        Plaintiff is correct in noting that Dr. Harris' examination included clinical
10 findings such as tenderness of the lumbar spine in May and October, 2002, limited range of
11 motion, decreased sensation in the lower extremities, pain with extension, and worsening back
12 and leg pain. (Tr. at 133, 134, 142, 144, 212). It is also true that plaintiff underwent a lumbar
13 discography on March 5, 2003, which showed that the discogram at L5-S1 was positive with
14 severe fully concordant low back pain, and annular disruption. (Id. at 147.) There was also a
15 cervical distribution sensory nerve conduction threshold amplitude study done on October 2,
16 2002. (Tr. at 225.) The findings were severe at left C6, and very severe at left C8 and bilateral
17 C7. (Id.) The ALJ acknowledged these two clinical studies, (Tr. at 16), but chose to rely on the
18 opinions of other practitioners.[4]

19       Dr. Roberson, a consulting neurologist, evaluated plaintiff on November 6, 2004,
20 with a full set of medical records.[5] He noted that plaintiff recently had undergone neck surgery
21 and was wearing a collar. Therefore he could not determine range of motion in plaintiff's neck.

---

[4] The ALJ also pointed out that although Drs. Harris and Meeks opined that plaintiff was temporarily totally disabled, he was not bound by these determinations because they were made for workers compensation purposes, and the remainder of the record did not support such a finding. (Tr. at 20.)

[5] Plaintiff makes the argument that it is unlikely that Dr. Roberson received a full set of medical records, and if he did, it is unlikely that he reviewed them. Plaintiff has given no basis for this argument, and therefore it is rejected.

1  (Id. at 252.)  He thought that even considering his cervical limitations, plaintiff could stand, walk
2  or sit for six hours of a work day, lift and/or carry ten pounds frequently, and 20 pounds
3  occasionally.  (Id. at 254.)  The only limitations would be postural in nature, such as crawling,
4  climbing, and feeling in plaintiff's left arm, such as where temperature is involved.  (Id.)  It is
5  interesting to note, as did the ALJ, that although both Drs. Harris and Roberson had access to
6  many of the same medical records which they reviewed in forming their opinions, those opinions
7  were quite different.  Part of the explanation may be that Dr. Roberson's opinion was post-
8  cervical microdiskectomy (October, 2004) which resulted in good improvement and decreased
9  pain, while Dr. Harris' most recent record was dated June, 2004.  (Tr. at 250.)  Dr. Roberson did
10 note the marginal success of three previous epidurals and three facet injections; however,
11 plaintiff planned to be evaluated for lumbar surgery after he recovered from his recent cervical
12 surgery.  (Id. at 251.)

13         The SSA Dr. also thought plaintiff could do light work.  He concluded that
14 plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk at least
15 two hours a day, sit for six hours, push or pull without limitation, and was only occasionally
16 limited in climbing, balancing, stooping, kneeling, crouching and crawling.  (Id. at 201-02.)

17         The ALJ also considered plaintiff's daily activities in his determination not to give
18 controlling weight to Dr. Harris.  There is a report by Dr. Mahajan, an anesthesiologist, who
19 noted plaintiff's statement that his pain decreases and his functioning increases when he takes
20 Norco.  (Tr. at 238.)  As a result, he can do light housework, drive a car, run errands, and go to
21 the store.  (Id.)  He also reported to Dr. Roberson that he can help around the house, doing
22 dishes, dusting, some vacuuming, some cooking, yard work, a little raking, and some mowing
23 with a self-propelled mower.  (Id. at 251.)  Plaintiff refers to another part of Dr. Mahajan's
24 report, in which plaintiff stated that he could not do the aforementioned chores.  (Id. at 234.)
25 These subjective complaints do not take into account the medication which allows him to be
26 more functional, as plaintiff acknowledged to Dr. Mahajan.  (Id. at 238.)

7

1    Other clinical findings support the ALJ's decision.[6] An MRI of the cervical spine
2 on April 26, 2004 indicated central disk bulging at C3-4, C4-5, and C5-6, but no compression of
3 the spinal cord. (Tr. at 211.) Plaintiff argues that this MRI shows plaintiff's condition to be
4 more serious than the earlier March, 2002 MRI referred to by the ALJ. The ALJ's decision,
5 however, refers to both MRIs. More importantly, the March, 2002 MRI was of the lumbar spine,
6 while the April, 2004 MRI was of the cervical spine. (Tr. at 116, 211.) The April, 2004 MRI
7 was also taken before plaintiff's October 20, 2004 microdiskectomy at C5-6, and C6-7. After
8 this surgery, plaintiff reported that it was "real good surgery," and told Dr. Roberson he no longer
9 has any pain radiating to his left arm, or any sensory symptoms in that arm. (Id. at 250.)
10 Although he still had some pain in his neck, it was greatly improved. (Id.) This report was in
11 contrast to plaintiff's pre-surgery report to surgeon Dr. Kim in which he described his neck and
12 resulting arm pain as severe and constant. (Id. at 229.)

13    The 2002 MRI of the lumbar spine indicated that plaintiff had mild disc
14 dessication, that there was no marrow signal abnormality, no prevertebral or paraspinous soft
15 tissue mass, and no abnormal signal in the distal cord at T12-L1. (Id. at 116.) At L5-S1, there
16 was a mild disc bulge with no foraminal narrowing, central canal stenosis or impingement.
17 There was no other disc bulge, protrusion, narrowing, stenosis or impingement at any other point
18 on the lumbar spine. (Id.)

19    The Commissioner makes the point that Dr. Harris focused on plaintiff's lumbar
20 problems while Dr. Roberson reviewed both lumbar and cervical impairments. As it turns out,
21 plaintiff's cervical impairment appears to have been more severe; however, as mentioned,

---

[6] The Commissioner refers to steroid epidural injections and bilateral lumbar facet injections, and the record indicates plaintiff reported good pain relief immediately following these procedures. (Tr. at 16, 155, 157, 159, 167.) Plaintiff's comments were made after the procedure in the recovery room, however, when he was still under anesthesia which only provides pain relief until it wears off a few hours later. Whether more long term pain relief is provided as a result of these procedures is unknown until a few days later. http://orthopedics.about.com. It appears, as plaintiff asserts, that he did not obtain relief from the epidurals, especially since he underwent three of them.

plaintiff obtained good results from surgery.

One complication is that the last record by plaintiff's treating physician, Dr. Harris, is dated June, 2004. Plaintiff began treatment with Dr. Kim in February, 2004, and Dr. Kim performed the microdiskectomy in October, 2004. Nevertheless, there is no treating record following this cervical surgery. The ALJ therefore took it upon himself to obtain the consulting exam by Dr. Roberson on November 6, 2004, after the administrative hearing, and informed plaintiff's counsel of this fact on December 8, 2004, with enclosure of the consultative exam. The ALJ gave plaintiff the opportunity to submit comments, additional records or request a supplemental hearing. (Id. at 112.) Plaintiff's counsel did submit comments in response and requested a supplemental hearing. (Tr. at 114-15.) The ALJ apparently denied this request despite his stated intention to grant the request. (Tr. at 112, 262.) Despite this apparent problem, the ALJ should be credited with actually developing the record where plaintiff was lacking medical records after October, 2004.

In any event, substantial evidence supports the ALJ's decision to rely on Dr. Roberson and the State Agency physician rather than on Dr. Harris insofar as plaintiff 's complaint of permanent disability is concerned.

However, the ALJ (and the parties), despite the medical record, addressed plaintiff's condition as if it were completely stationary and permanent throughout the 2002-2004 time period, and that the case consists of varying opinions of medical personnel, no matter when given, looking at a static condition. It also assumes that plaintiff's activities never varied over the course of lengthy medical treatment periods, and hence that a one-size-fits-all credibility determination can be made. It further assumes that plaintiff's neck condition was the same before and after his fairly major operation. Of course, the real world is much different, and because the administrative process is a non-adversarial proceeding, the ALJ, even if denying permanent social security disability benefits, should analyze lengthy time periods with an eye that plaintiff's medical condition may have been very severe at one point but better resolved at a later

period. It is this analysis which may permit the award of disability benefits for a closed period. The medical record in this case figuratively begs for this type of analysis.[7]

A "closed period" refers to a claimant's disability which started and stopped prior to the ALJ's decision. In a closed period of disability, starting and ending dates for disability benefits are determined in the same decision. See, eg., Pickett v. Bowen, 833 F.2d 288, 289 n.1, 291 (11th Cir. 1987).

There is objective evidence of plaintiff's cervical problems dating back to September 19, 2002 when plaintiff's MRI showed mild bulging at C3-4, and bulging and impingement at C5-6 and C6-7 with degenerative changes resulting in foraminal narrowing. (Tr. at 217-18.) As mentioned earlier, a cervical distribution sensory nerve conduction threshold amplitude done on October 2, 2002 contained the following findings: severe at left C6, and very severe at left C8 and bilateral C7. (Id. at 225.) On January 18, January 28, February 10, 2003, plaintiff had steroid epidural injections in the cervical area. (Id. at 190, 193.) On April 15, 2003, plaintiff underwent cervical facet injections. (Id. at 187.) On April 24, May 7, and May 21, 2003, plaintiff underwent radiofrequency cervical facet neurotomies at C3-4, C4-5, and C5-6. At this time, plaintiff was diagnosed with cervical radiculopathy, degenerative cervical spine/disc/facet disease, cervical spondylosis/stenosis, and bilateral cervical facet syndrome. (Tr. at 178, 181.) Another MRI on April 26, 2004 showed disc bulging also at C3-4, C4-5, and C5-6 without compression of the spinal cord. (Tr. at 211.) It was not until his cervical microdiskectomy on October 24, 2004, that plaintiff reported its success. His pain was greatly alleviated, and he no longer had pain radiating to his left arm. (Id. at 250.)

\\\\\

---

[7] This is not to say that medical records substantially pre-dating the administrative hearing are valueless; on the contrary, they may have great significance in determining the level of appropriate activity possible at the time of the administrative hearing, and then into the future. The issue depends on the nature of the records and the historical facts. Obviously, in this case plaintiff's neck condition changed substantially from its pre-operation status; the same cannot be said for plaintiff's lower back condition.

The ALJ failed to analyze whether plaintiff's cervical problems rendered him disabled prior to his surgery; he only discussed plaintiff's current status at the time of hearing. The court finds based on the aforementioned evidence, that the ALJ erred in this respect. Plaintiff was clearly entitled to a closed period of disability for the period from May 17, 2002 to October 24, 2004.[8]

Having found that the ALJ lacked substantial evidence for not finding plaintiff disabled up to October 24, 2004, in the remaining sections, the court addresses plaintiff's request for permanent disability benefits only as seen from that time forward.

B.  Whether the ALJ Erred in Failing to Consider Plaintiff's Mental and Physical Non-Exertional Impairments

Plaintiff next asserts that the ALJ failed to consider his pain, and Dr. Harris' limitations including the need to take frequent breaks, and need to walk for fifteen minutes every fifteen to forty-five minutes. To the extent that Dr. Harris limited plaintiff's functioning, his opinion has been analyzed in the previous section. Whether the ALJ properly analyzed plaintiff's complaints of pain will be discussed pursuant to credibility standards.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible

---

[8] Given the clarity of the record prior to October 24, 2004, the court finds no need to remand this aspect of the case to the ALJ for determination.

11

solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[9] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

Here, the ALJ reviewed all the reasons he thought plaintiff's complaints of pain were not credible. First, both the state agency physician and Dr. Roberson thought plaintiff could do light work. (Tr. at 19.) Plaintiff's daily activities also suggested he could do light work. (Id.) The ALJ then reviewed the objective evidence which he thought did not support the pain alleged. For example, MRI of the lumbar spine indicated only mild disc bulging with no foraminal narrowing, central canal stenosis or impingement on nerve roots. The cervical MRI showed disc

---

[9] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

12

bulging with degenerative changes, foraminal narrowing, impingement on nerve roots at C5-6 and C6-7, but only mild bulging at C3-4 with no central canal stenosis or impingement.[10]  (Id.) The ALJ also thought Dr. Harris' report did not reflect the pain alleged, for it indicated only tenderness on palpation of the spine, some decreased range of motion, and patchy decreased sensation of the lower extremities.  (Id.)  The ALJ additionally discussed other clinical records which did not support plaintiff's complaints.  He then noted that plaintiff reported Norco alleviated his pain and allowed him to be more functional in housework and errands.  (Id. at 20.) The ALJ relied on Dr. Roberson's report which indicated that plaintiff's cervical problems and pain radiating to his left arm were greatly improved by his neck surgery.  (Id.)  Finally, the ALJ stated that plaintiff had no records of emergency room visits or physical therapy after August, 2002.

The ALJ also reported that there were no physical difficulties observed at the SSA office when plaintiff turned in his application; however, the record is not so clear on this point.  It is true that the claims representative noticed that plaintiff had no difficulty in sitting, standing, walking, using his hands or writing.  It was also reported, however, that plaintiff had some difficulty concentrating during the interview, complained to his wife about pain, and held a device that was for use with pain.  (Tr. at 65.)

Although the ALJ did discuss the objective medical evidence, he also addressed medication and how it helped the pain, and plaintiff's termination of physical therapy two years before the administrative hearing.  The ALJ also relied on the opinion of Dr. Roberson who had the opportunity to evaluate plaintiff's pain with a complete exam.  This neurologist noted that plaintiff's pain after cervical surgery had decreased from 8/10 to 4/10.  Although the lumbar pain was still reported to be 6-8/10 and described as constant and gripping, Dr. Roberson noted all of the activities plaintiff was able to do.  See discussion Section A *supra*.  This physician also noted

---

[10] As noted in the previous section, the court disagrees with the ALJ's assessment of plaintiff's cervical condition prior to his surgery.

that plaintiff had no difficulty walking into the exam room or getting onto the examination table, had no problem removing or replacing shoes and socks, and sat comfortably throughout the interview. (Id. at 251.)

Many of the records predate plaintiff's October, 2004 microdiskectomy, and therefore much of the pain alleged as it relates to the cervical area should be considered only in regard to the period prior to surgery. The ALJ properly analyzed the evidence relating to plaintiff's lumbar pain in relation to the appropriate factors required by the Bunnell line of cases.

C. Whether the ALJ Should Have Obtained Testimony From a Vocational Expert

Plaintiff contends that the ALJ should have utilized a vocational expert based on his nonexertional limitations and severe pain. Plaintiff claims that the ALJ erred in not obtaining this expert in lieu of using the grids. Of course, the ALJ never reached the grids stage because he found that plaintiff could do his past work. The court will analyze use of a vocational expert at this past work stage of the analysis.

In this case, the ALJ found at step four that plaintiff could do his past work as distribution center manager as performed in the national economy.[11] This job is found in the Dictionary of Occupational Titles 185.167-018 (4th ed. 1991).[12] It requires directing and coordinating activities at a wholesale distribution warehouse, including reviewing bills of lading, assigning duties to workers, establishing operational procedures, handling and disposition of merchandise, keeping warehouse inventory, coordinating warehouse activities with sales, record

---

[11] Other past work included general manager, restaurant manager, bartender, and clerk.

[12] The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements. It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled. (Id.) Each job is assigned a number reflecting how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time. (Id.) The DOT is a primary source of reliable job information for the Commissioner. 20 C.F.R. § 404.1566(d)(1).

control and purchasing departments to ensure availability of merchandise, and directing reclamation of damaged merchandise. (Id.; tr. at 89, 96) This job is sedentary work which involves exerting up to ten pounds of force occasionally and a negligible amount of force frequently. It involves sitting most of the time but may include walking or standing for brief periods. (Id.)

Plaintiff bears the burden of proving he suffers from a physical or mental impairment that makes him unable to perform "past relevant work." Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir.1995). Plaintiff cannot merely show he is incapable of performing the particular job he once did; he must prove he cannot return to the same type of work. Villa v. Heckler, 797 F.2d 794, 798 (9th Cir.1986). In determining whether a disability applicant can perform past work, the Commissioner may consider work as it was actually performed, or as it is normally performed in the national economy. The ALJ determines the demands of a past job and compares the demands to current RFC. Villa, 797 F.2d at 798.

The ALJ found that plaintiff could do his past job as distribution manager in a warehouse, as performed in the national economy. It is considered sedentary work, and involves no frequent lifting, carrying, pushing, and pulling. DOT 185.167-018. Stooping is not required.[13] Frequent handling, reaching and fingering is required. (Id.) It was not necessary for the Commissioner to call a vocational expert because the production burden never shifted to the Commissioner. See Miller v. Heckler, 770 F.2d 845, 850 (9th Cir.1985). The ALJ may consider the testimony of a vocational expert to determine if plaintiff can do his past relevant work, see

---

[13] Plaintiff argues that his complete inability to stoop significantly erodes the occupational base; however, defendant correctly points out that no physician assigned such a restriction. The SSA physician only limited plaintiff to occasional stooping. (Tr. at 202.) Furthermore, this doctor did not limit bending. (Id.) Nevertheless, any argument on this issue is moot as plaintiff's past work does not involve stooping. Likewise, Dr. Roberson's limitation of no crawling or climbing due to plaintiff's cervical collar and limited range of motion do not implicate this job which does not involve these activities.
Plaintiff's contention that his limitations do not permit him to do light work is also irrelevant as the ALJ found he could do his past work, which is sedentary in nature.

1  Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001); however, the ALJ is not required to call
2  such an expert at the fourth step.  See Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996).
3          Likewise, the ALJ was not required to call a vocational expert based on plaintiff's
4  claim that he had nonexertional limitations due to a need to take frequent unscheduled breaks
5  lasting fifteen to twenty minutes each day, and a need to walk for fifteen minutes every fifteen to
6  forty-five minutes, as well as pain.  The need for breaks to walk, as assessed by Dr. Harris, has
7  already been properly rejected in Sections A and B supra.  Plaintiff's cervical pain was alleviated
8  by surgery, his lumbar pain appears to be controllable, as evidenced by the remainder of the
9  record which indicates it is not severe enough to interfere with work.
10         This circuit has held that only if a nonexertional impairment is significant enough
11 to limit plaintiff's work *in a certain category* must the ALJ resort to a vocational expert.
12 Perimeter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985) (finding lack of evidence of ability to
13 perform specific jobs; Blackall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983)).  See also Ode
14 v. Heckler, 707 F.2d 439 (9th Cir. 1983) (requiring significant limitation on exertional abilities in
15 order to depart from the grids).  In this case, plaintiff has no nonexertional impairments and the
16 analysis properly ends at step four.  Consequently, a vocational expert was not required.  Plaintiff
17 has also failed to show that he could not return to his previous job, the burden of proof having
18 remained with him.
19 CONCLUSION
20         Accordingly, the court finds the ALJ's assessment is supported by substantial
21 evidence in the record and based on the proper legal standards, except in regard to plaintiff's pre-
22 surgery cervical impairment, for the period between May 17, 2002 and October 24, 2004, for
23 which plaintiff should be granted benefits for a closed period of disability.
24         IT IS HEREBY RECOMMENDED that: Plaintiff's Motion for Summary
25 Judgment or Remand be granted in part, the Commissioner's Cross Motion for Summary
26 Judgment be denied in part, this case be remanded to the Commissioner pursuant to sentence four

1  of 42 U.S.C. § 405(g) for a computation of benefits, and the Clerk of Court be directed to enter
2  final judgment.
3        These findings and recommendations are submitted to the United States District
4  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten
5  (10) days after being served with these findings and recommendations, any party may file written
6  objections with the court and serve a copy on all parties.  Such a document should be captioned
7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
8  shall be served and filed within ten (10) days after service of the objections.  The parties are
9  advised that failure to file objections within the specified time may waive the right to appeal the
10 District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
11 DATED: 2/13/07

                   /s/ Gregory G. Hollows

                   GREGORY G. HOLLOWS
                   U.S. MAGISTRATE JUDGE

GGH/076
Allio1361.ss.wpd